48 CCPA

**Application of Franz BERGEL and John Albert Stock.**

**Patent Appeal No. 6676.**

United States Court of Customs and Patent Appeals.

July 21, 1961.

James W. Dent, Washington, D. C., and Albert L. Jacobs, New York City, for appellants.

Clarence W. Moore, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

WORLEY, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of claims 1 to 6, inclusive, of appellants' application, No. 415,964, for a patent on chemotherapeutic agents and processes for manufacturing them. Claims 1 and 3, which are typical of the appealed claims, are as follows:

"1. $p$-Bis-(2-chloroethyl)-aminophenylalanine.

"3. A process for the manufacture of p-bis-(2-chloroethyl)-aminophenylalanine which comprises heating a compound of the general formula:

$$(\text{HOCH}_2\text{CH}_2)_2\text{N} \langle \rangle -\text{CH}_2.\text{CR}_1-\text{COOC}_2\text{H}_5$$
$$\mid$$
$$\text{NR}_2\text{R}_3$$

in which $R_1$ is selected from the group consisting of hydrogen and the $COOC_2H_5$ radical, $R_2$ is hydrogen and $R_3$ is selected from the group consisting of CHO and $CH_3CO$ radicals or $R_2$ and $R_3$ together represent the

$$\text{OC}-\langle\rangle$$
$$\text{OC}-$$

[1] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

radical, with a chlorinating agent selected from the group consisting of phosphorous oxychloride and thionyl chloride."

All claims were rejected on the ground that the claimed compounds, and therefore the processes by which they are made, have not been shown to have "utility" within the meaning of the applicable statute (35 U.S.C. § 101); and claims 1 and 2 were further rejected on the ground that the compounds which they recite are unpatentable in view of the prior art.

The references relied on are:

Everett et al., Journal of the Chem. Soc. (London) 1949, Part III, pages 1972 to 1983; Harper et al.—Chem. Abstracts Vol. 45 (1951) Col. 7193.

The rejection of claims 1 and 2 on prior art will be considered first. The compounds defined by those claims are, respectively, p-Bis-(2-chloroethyl)-aminophenylalanine and its laevo isomer. The Harper et al. reference discloses p-diethylamino-phenylalanine. The examiner states that the compound of claims 1 and 2 is "a chlorine analog" of the Harper et al. compound, by which he apparently means that a part of the hydrogen of the Harper et al. compound is replaced by chlorine to form the claimed compounds. The examiner further noted that Everett et al. disclose compounds generally similar to those claimed by appellants and prepared by chlorination, and propose the use of such compounds in anti-tumor therapy. On the basis of those statements, which appear to be correct, the examiner concluded that the compounds of claims 1 and 2 represent "merely an expected modification of the Harper et al. compounds when viewed in the light of the Everett et al. teaching * * *." The same position was taken by the board.

The portion of the Everett et al. disclosure which is principally relied on in support of the rejection is the statement that "Many aryldi-(2 halogenoethyl) amines * * * show interesting biological properties, notably an inhibiting effect on the growth of certain trans-plantable rat tumors." The group of compounds thus recited is quite large, and Everett et al. do not indicate that all, or even most of them, have the stated property. Their disclosure, therefore, cannot properly be taken as a suggestion to prepare and test every conceivable compound of the group. It is true that Harper et al. disclose compounds which, by the substitution of chlorine, a halogen, for part of the hydrogen, may be converted to the compounds recited in appealed claims 1 and 2, but, in our opinion, such conversion would not be obvious in the absence of any suggestion in the prior art as to why it should be made. The examiner and the board were of the opinion that such a suggestion is found in the statement by Everett et al. that many of the halogen compounds to which they refer have an inhibiting effect on rat tumors. That might be more tenable if there were anything to lead one to suppose that the Harper et al. compounds had any tumor inhibiting tendency. In that case, the disclosure of Everett et al. that halogenated compounds of the same general class inhibited tumors might suggest the desirability of incorporating a halogen in the Harper et al. compounds, with a view of increasing that effect. However, the only use to which Harper et al. refer in connection with p-diethylamino-phenylalanine is as metabolic antagonist for the *bacillus enconostoc mesenteroids*, and even for that purpose they state that none of the compounds tested was inhibitory. We fail to see anything in that disclosure to suggest that the compounds disclosed, or any others based on them, would be likely to inhibit the growth of tumors in rats.

On this record, we find nothing which would suggest any combination of the disclosures of Everett et al. and Harper et al. to produce the compounds claimed here. The mere fact that it is *possible* to find two isolated disclosures which might be combined in such a way to produce a new compound does not necessarily render such production obvious unless the art also contains something to suggest the desirability of the proposed

combination. The board's rejection on the prior art is reversed.

The board's second ground of rejection is on lack of "utility." Appellants' assertion of utility is:

"This invention relates to chemotherapeutic agents and has as an object to provide an improved compound having tumour growth inhibitory action and process for the manufacture thereof.

\*   \*   \*   \*   \*   \*

"The L form has greater tumour growth inhibitory action than either the D form or the racemic form. *All forms are, however, effective tumour growth inhibitors when tested against transplanted Walker rat carcinoma.*" (Emphasis ours.)

In support of its rejection the board reasoned that "protection of rats, or mice, from the growth of cancer, specifically transplanted Walker rat carcinoma, is not in itself a sufficient usefulness within the purview of the patent statutes \* \* \*," further stating that "the elimination of rodents themselves would seem to be a more desirable objective."

Presumably, therefore, if the instant compounds were intended to poison rats their utility would not have been questioned. The board's premise that the compounds are designed to "protect rats or mice from the growth of cancer," or, as stated by the same board in companion appeal, Patent Appeal No. 6666, that "the continued disease-free existence of rodents is not a desirable objective" is not tenable.

Much the same question was raised when the companion proceeding was before the examiner. In their brief on appeal to the board there, appellants urged that:

"Applicants have shown, particularly in the aforesaid copending application Serial No. 415,964, that the L form has great utility in the treatment of rat carcinoma and thus unquestionably has pharmacological utility. The Examiner gives this no weight on the ground that the suc-cessful treatment of rat carcinoma is not to be considered as utility. It has been explained, however, that all chemotherapeutic agents are first used pharmacologically on animals prior to their use in clinical cases. The use of the compounds produced by the present process on rats has been outstandingly successful and results have been achieved which have not been approximated before. This is clearly utility because if a failure was made in the pharmacological tests, then lack of utility would be shown and the compounds in question would be discarded and not tried on human patients. The Examiner's position, therefore, fails to take into account not only the standard practice involved with new chemotherapeutic agents, but further overlooks the highly significant fact that pharmacological success must precede clinical trials."

Further elaboration of appellants' objective is found in their brief to this court:

"It is submitted that the Board of Appeals was in error in holding that the inhibition of tumors in rats or mice is not in itself a utility within the purview of 35 U.S.C. 101, since the continued disease-free existence of rodents is not considered a desirable objective. This is a rather extraordinary statement which misconstrues Appellants' invention and raises a fallacious issue. Appellants are not concerned with the health or existence of rodents as such but are only concerned with the rodents as a means for testing their new compounds. The holding of the Board of Appeals overlooks the widespread practice of carrying out pharmacological work in animals as a screening procedure, and of the many thousands of new drugs tested each year, only a very few successfully pass the pharmacological animal tests. This success is a plain indication of utility and indicates that the particular drug can then be clin-

ically tested. The rodents are usually sacrificed after the tests and given post-morten examination thereby revealing much useful information. There are many animal farms and laboratories which specialize in the raising and supplying of rodents for just such purposes and it is not understood why the position should be taken that rodents should be completely eliminated. This may be quite true insofar as certain aspects of rodent infestation are involved in large cities, for example, but frankly such *as* no bearing upon the present appeal."

The pertinent statutory provisions for so-called "utility" is found in Title 35 U.S.C. § 101 which reads:

"101. Inventions patentable

"Whoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any new and *useful* improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." (Emphasis added.)

That appellants' compounds actually do inhibit the growth of the transplanted cancer strain is not questioned. In our opinion that achievement is sufficient to satisfy the express language of Section 101, and is in harmony with the basic constitutional concept of promoting the progress of science and the useful arts.[1]

Our conclusion is influenced by a background of common knowledge that cancer is one of the dreadest of all diseases; that for years untold measures of time, talent, and treasure have been devoted to a search for means to prevent its spread and discover a cure; and that as of now those measures have been largely unsuccessful.

We are familiar with the cases cited by counsel but find none of them suffi-

ciently in point to be controlling. Those decisions are based on those facts, just as our decision here is based on the instant facts, and should not be construed as laying down a sweeping principle that any and all compounds are in and of themselves "useful."

The decision is reversed.

Reversed.

KIRKPATRICK, J., sat but did not participate in decision.

48 CCPA

---

1. Article I, Section 8. "The Congress shall have Power

\*    \*    \*    \*    \*

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;"