51 CCPA
**Application of Andrew John MANSON.**

**Patent Appeal No. 7140.**

United States Court of Customs and Patent Appeals.
June 25, 1964.

Laurence & Laurence, Washington, D. C. (Dean Laurence, John L. White, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

The single legal issue presented by this appeal is whether an applicant for a patent on a *new process* for making a *known compound* must establish a utility for such *compound,* in order to satisfy the requirements of Rule 204(b) preparatory to having an interference declared between his application and a prior patent.

It is unnecessary to encumber this opinion with any of the technical details of the process covered by appealed claims 2 and 3 of appellant's application.[1] These claims stand rejected as "obviously fully met" by a patent to Ringold et al.[2] Appealed claim 3 corresponds to claim 4 of the Ringold patent and was so written for the purpose of provoking an interference with that patent. Appealed claims 2 and 3 differ only in scope and we shall there-

fore treat both claims as one for purposes of this opinion.

As required by Rule 204(b), appellant filed certain affidavits which purported to show that he was prima facie entitled to an award of priority of invention relative to the filing date of the Ringold patent. Among other things, these affidavits alleged that the compound produced by the claimed process was known in the art and that its utility was obvious to appellant at the time he invented the process. The examiner, however, took the position that the affidavits were deficient in that they did not clearly show a utility for the compound produced by the claimed process and thus that appellant had not shown that he had made a "useful" invention prior to the filing date of the Ringold patent. This position was summarized by the board as follows:

"It does not appear that the Examiner questions the affidavits filed under the provisions of Rule 204(b) except as to the showing relative to the utility of the compounds produced by the process of claim 3. The issue presented is whether the affidavits are sufficient in the [this?] respect. * * *"

The board, placing its reliance on language found in inter partes interference decisions dealing with what constitutes a reduction to practice of an invention, then concluded:

"* * * we cannot agree that a process is *prima facie* useful merely because the product is disclosed in the literature unless the product was known to be useful."

■■ Thus the board would require that before an applicant may have his claims to a new *process* placed in interference to determine the issue of priority of invention pursuant to 35 U.S.C. § 135, he must show that a utility for the *compound* produced by the process was known at the time he invented the process. This requirement cannot be justified in view of

1. Serial No. 3,693, filed January 20, 1960, for "Preparation of Organic Compounds."

2. No. 2,908,693, issued October 13, 1959, entitled "Production of 2-Methyl-Dihydro-testosterones."

35 U.S.C. § 101. As there defined, a process is a separate category of patentable invention. Clearly, a process which operates as disclosed to produce a known product is "useful" within the meaning of section 101. To add to this section the further requirement that such a process is "useful" only when a "use" for a known end product is disclosed seems to us to be an improper arrogation of the authority delegated to Congress by the Constitution. Had such a restriction been intended by Congress, we believe it would have been directly stated either in section 101 or in the definition of a process found in section 100(b). We take the omission of any such requirement to be determinative of the issue here.

We had hoped that our views set forth in In re Dickinson and Zenitz, 299 F.2d 954, 49 CCPA 951, as to the Commissioner's duties and responsibilities under the statutory provisions and the rules of practice here in issue, would have been considered as determinative of the issues here. While we agree with the board that the *facts* in the Dickinson and Zenitz case distinguish it from the *facts* here, we think what was there said is pertinent as to the basic legal right of the appellant to have the issue of priority of invention duly determined as provided in section 135. To the end that there shall be no mistake as to the portions of the Dickinson and Zenitz opinion which we think should have been applied in this case, they are quoted as follows (299 F.2d at 957, 49 CCPA at 957–958):

"There is no question but that under 35 U.S.C. § 135, the Commissioner is required to initiate interference proceedings by giving notice to the parties whenever, *in his opinion*, an application would interfere with any pending application or with any unexpired patent.

"Further, under 35 U.S.C. § 6, subject to the approval of the Secretary of Commerce, he 'may * * * establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent Office.' Also, it is equally clear that, unless specifically prohibited by law, the Commissioner may delegate his duties.

"On the other hand, in performing his duties, the Commissioner cannot usurp the functions or impinge upon the jurisdiction of the Board of Patent Interferences established by 35 U.S.C. § 135.

"In applying these principles to the case at bar, it is obvious that the Commissioner could promulgate a rule to cover the factual situation that is presented in this and similar cases. This he did in establishing Rule 204(b). Also, he could delegate to the Primary Examiner and the Assistant Commissioner his responsibilities under Section 135, and they could decide in the first instance whether a prima facie case had been presented by applicant.

\* \* \* \* \* \*

"The 'opinion' of the Commissioner that is required in Section 135 pertains to the factual question of whether the claims of the application would interfere with the claims of the patent, and whether a prima facie case has been alleged. The question of priority is to be determined by the Board of Patent Interferences and such factors, as what is necessary to show reduction to practice in a particular case, come within the exclusive jurisdiction of that board. It should be kept in mind, however, that a patentee ought not to be compelled to go through an interference proceeding without reasonable cause.

"Although Rule 204(b) indicates that the required affidavit must be in the nature of that specified in Rule 131, obviously, any provision of Rule 131 which requires more than the statute contemplates in connection with a Rule 204(b) proceeding would not be applicable, as in the case at bar. \* \* \*"

In the Dickinson and Zenitz case we held that for purposes of a prima facie showing of actual reduction to practice of a chemical compound, the utility require-

ment of section 101 was satisfied by alleging merely that "the utility [of the claimed compound] was obvious to us at the time we submitted the compound for testing which was prior to August 16, 1955 [the critical date]." It is our opinion that, if the requirement of a prima facie showing of utility of a claimed compound may be satisfied by the statement that such utility was "obvious" at the time the invention was made, then a fortiori the requirement is satisfied where no question is raised as to the operability of the claimed chemical process to produce a known compound.

It seems clear from the present record that the Patent Office refused to accept appellant's affidavits on the philosophical basis that unless a compound is known to be useful, a process for making the compound is not useful under section 101 and hence not patentable. Thus the case of In re Wilke and Pfohl, 314 F.2d 558, 50 CCPA 964, cited by appellant and argued by both parties, is not directly controlling here since it dealt with the adequacy of the specification with respect to a disclosure of "how to use" under section 112. Wilke is of value, however, in that it indicates the recent thinking of this court with respect to utility issues. In Wilke, speaking to the section 112 issue, we said:

" * * * We decline to apply to these process claims the statement in the Bremner case from which the Patent Office has extracted the so-called 'rule of Bremner,' i. e., that the specification must teach a use for the product of a claimed process. Had this been the intent of Congress, we are certain that it would have been so stated in 35 U.S.C. § 112. * * * "

The relevance of this statement to the present case seems clear. If, to be patentable, a process must not only produce a product but a product known or proved to be useful, then it follows that an application for a patent on such a process would have to disclose how to use the product. But the holding in Wilke is to the contrary. See also In re Adams et al., 316 F.2d 476, 50 CCPA 1185.

In the Bremner case [In re Bremner et al., 182 F.2d 216, 37 CCPA 1032], this court said, "It was never intended that a patent be granted upon a product, or a process producing a product, unless such product be useful." That this statement is correct with respect to product claims is beyond doubt. 35 U.S. C. § 101. As to whether a specification must show how to use the product of a claimed process, however, our holding in Wilke made it abundantly clear that it is not necessary so to do. In the present case, our holding that where a claimed process produces a known product it is not necessary to show utility for the product eradicates, as to process claims, whatever remained of the so-called "rule of Bremner" subsequent to our decision in Wilke. See also In re Szwarc, 319 F. 2d 277, 50 CCPA 1571.

Neither the solicitor nor appellant has cited a case, nor have we found any, which is contrary to our present holding. To be sure, in Petrocarbon Ltd. v. Watson, 101 U.S.App.D.C. 214, 247 F.2d 800 (1957), the court relied on the Bremner case in affirming a rejection of certain chemical process claims. However, as we pointed out in the Szwarc case, supra, the decision made no distinction between product and process claims and was based on the insufficiency of the disclosure of how to use the product produced by the claimed process as required by section 112. At any rate, for whatever the Petrocarbon case may be said to stand, we have already indicated, at some length, our disagreement with it in both the Szwarc case and In re Nelson et al., 280 F.2d 172, 47 CCPA 1031, and it would serve no useful purpose to labor the point further here.

The law regarding utility has enjoyed an uncommon stability over the years, in contrast to many other areas in the patent law. In the Nelson case, supra, we considered in some depth the ancient and persistent requirement of utility as a condition for patentability. As indicated by the many authorities there discussed, a process is "useful," as a matter of law, if it operates as disclosed to produce its

intended result or perform its intended function and if it is not, in operation or result, detrimental to the public interest.

As long ago as 1817, in Bedford v. Hunt, 3 Fed.Cas. p. 37 (No. 1,217) (C.C. D.Mass.), Justice Story articulated the basis for this general statement, when he said:

"* * * By useful invention, in the statute, is meant such a one as may be applied to some beneficial use in society, in contradistinction to an invention, which is injurious to the morals, the health, or the good order of society. It is not necessary to establish, that the invention is of such general utility, as to supersede all other inventions now in practice to accomplish the same purpose. It is sufficient, that it has no obnoxious or mischievous tendency, that it may be applied to practical uses, and that so far as it is applied, it is salutary. *If its practical utility be very limited, it will follow, that it will be of little or no profit to the inventor; and if it be trifling, it will sink into utter neglect. The law, however, does not look to the degree of utility; it simply requires, that it shall be capable of use, and that the use is such as sound morals and policy do not discountenance or prohibit.* * * *"
[Emphasis added.]

And again in the same year, in Lowell v. Lewis, 15 Fed.Cas. p. 1018 (No. 8,568) (C.C.D.Mass.), Justice Story said:

"* * * All that the law requires is, that the invention should not be frivolous or injurious to the well-being, good policy, or sound morals of society. The word "useful," therefore, is incorporated into the act in *contradistinction to mischievous or immoral.* For instance, a new invention to poison people, or to promote debauchery, or to facilitate private assassination, is not a patentable invention. *But if the invention steers wide of these objections, whether it be more or less useful is a circumstance very material to the interests of the patentee, but of no importance to the public. If it be not extensively useful, it will silently sink into contempt and disregard.* * * *"
[Emphasis added.] [3]

This basic rationale has persisted, unchanged, down to the present day, in this court as well as in the District of Columbia Circuit. As recently as 1961, the District Court for the District of Columbia stated, in Commonwealth Engineering Co. v. Ladd, 199 F.Supp. 51:

"This Court held in Isenstead v. Watson, 157 F.Supp. 7 [115 USPQ 408], that the term 'utility' is a broad term and implies, among other things, capacity to perform the function or attain the result claimed by the applicant in his disclosure. It further held that, in connection with a composition of matter, the test of utility is whether the invention will attain the purpose and will operate as disclosed and claimed by the inventor. Similarly, *in connection with an invention consisting of a process or a method, the term 'utility' must necessarily mean whether the process will operate as claimed and will produce the result intended by the inventor.*" [Emphasis added.]

In the present case it is admitted that appellant's claimed process meets these requirements. It operates as claimed and produces the result intended by the inventor. In addition, it has not been shown to be contrary to sound morals and policy. To put it another way, appellant's process *works* and is not alleged to be detrimental to the public interest. Under

3. In commenting on this language, one court has said that "A study of the cases reveals that the legal significance of 'useful' in the patent statute differs from the general conversational connotation of the word." Cusano v. Kotler, 159 F.2d 159, 162 (3d Cir. 1947). In that case the court held that the creation of a new game conforms to the patent requirement of being useful.

See also Callison v. Dean, 70 F.2d 55 (10th Cir. 1934), which held that a device which may be used for innocent amusement possesses utility.

239

such circumstances, appellant's affidavits under Rule 204(b) have made a legally sufficient prima facie showing as to his actual reduction to practice of the claimed process prior to the filing date of Ringold. He is, therefore, entitled under section 135 to a determination as to the issue of priority of invention.

The decision of the board is reversed.

Reversed.

WORLEY, Chief Judge (dissenting).

The Patent Office has given Manson an opportunity to show that his product is useful. Although that is his obligation he has been either unable or unwilling to do so. Therefore, the Patent Office quite properly rejected his application and should be affirmed.

I am aware of no authority for the novel proposition that a process which produces a useless product is patentable. Such a premise is wholly contrary to the Constitution and I am satisfied Congress did not intend the statutes enacted thereunder to be so construed.

In In re Oberweger, 115 F.2d 826, 28 CCPA 749, this court quoted with approval an earlier statement from In re Perrigo, 48 F.2d 965, 18 CCPA 1323:

"Neither the Patent Office tribunals nor the court may properly grant patents upon a mere possibility that a device might do the things claimed for it and be useful. There must be definiteness. Neither the Constitution nor the statutes contemplate the granting of patents upon theories, nor giving a monopoly upon intellectual speculations embodied in devices incapable of scientific analysis."

In Libbey-Owens-Ford Glass Co. v. Celanese, 135 F.2d 138, the Sixth Circuit Court of Appeals held:

"Controlling is the fact that such method claims are limited to the use of plastic compositions, with the identical ingredients and in the proportions of the three product claims, which have been already held to be insufficiently disclosed and inopera-

tive, and the process, therefore, lacks the further requisite of utility."

I appreciate the fact that Manson's product is a known compound which may—or may not—someday prove to be useful. However, for his process to possess the requisite statutory utility, it must presently be more than a mere invitation to others to determine that it is useful.