TWENTIER'S RESEARCH, INC., a corporation, and Max Twentier, Appellants,

v.

HOLLISTER INCORPORATED and The Firm of John Dickinson Schneider, Inc., a corporation, Appellees.

No. 18423.

United States Court of Appeals Ninth Circuit.

July 26, 1963.

Rehearing Denied Aug. 23, 1963.

Christy, Kleinman, Peterson & Hoyt, and Chester J. Peterson, Phoenix, Ariz., for appellants.

Hofgren, Wegner, Allen, Stellman & McCord, William J. Stellman, and James R. Sweeney, Chicago, Ill., for appellees.

Before HAMLIN and JERTBERG, Circuit Judges, and MADDEN, Judge of the Court of Claims.

JERTBERG, Circuit Judge.

A suit for infringement was brought below by appellees, owner and assignee of the Schneider patent No. 2,954,620, for "identification means." The individual defendant, Max Twentier, had been employed by appellee, The Firm of John Dickinson Schneider, Inc., in 1958 as its marketing manager. Subsequent to the termination of his employment with Schneider, Mr. Twentier created the other defendant, Twentier's Research, Inc., which company began the manufacture and sale of the accused device. A second cause of action alleged that Max Twentier had unfairly competed with appellees.

The court below found the Schneider patent to be valid and infringed by both appellants, but the proof to be insufficient to establish the cause of action based on unfair competition. The defendants appealed from the lower court's determination that the Schneider patent is valid; no cross-appeal was taken.

The nature of the patent in suit and the state of the prior art may best be disclosed by setting forth certain of the findings of fact of the trial court.

"(11) The invention disclosed in the patent in suit relates to an identification means in the form of a band adapted to be encircled about a member to be identified and is particularly useful in identifying inmates of hospitals and other institutions of similar nature. The band has found substantial use in identifying people not able or desirous of identifying themselves, such as patients in hospitals or asylums and inmates in jails.

"(12) The need for accurate and positive identification of patients has existed as long as hospitals have been in existence. Misidentification of patients in hospitals has led to tragic results. This is particularly true in the area of medication where misidentification of patients leads to a patient getting medication he should not have received, and the corollary of a second patient not getting the medication he should have gotten. Surgical errors of serious and sometimes fatal consequences have resulted from patient misidentification.

"(13) By the middle of the last decade, the situation had become so serious that in the State of California, for example, hospitals found it extremely difficult to obtain adequate malpractice insurance insuring them against losses resulting from patient misidentification. In the field of medication errors alone, approximately 45% of all the errors were due to patient misidentification. As a result, the California Hospital Association through its Insurance Council instituted a study of the situation in an effort to find a solution for the problem.

"(14) Prior to the invention of the patent in suit many methods of identifying patients in hospitals had been attempted. None of such methods was satisfactory.

"(15) A suitable patient identification means for use in hospitals and other institutions is one which meets the following criteria. It must be one which is attached to and hence travels with the patient. It must be one which is readily visible and must be non-removable except by tearing, or cutting, or other means, rendering the fact that it has been removed obvious. After being removed, the band should also be non-replaceable. The identification means must carry pertinent data positively identifying the patient and such data must be protected against alteration or obliteration due to contact with or exposure to moisture. The identification means should be non-irritating and comfortable for the patient to wear and should be individually fitted to each patient. These criteria created the problem not the solution.

"(16) Prior to the invention disclosed in the patent in suit, none of the proposed patient identification systems met the foregoing criteria. Such prior systems included the placing of the patient's name on the door of the hospital room or on the bed to which the patient was assigned. Such means provided no identification of the patient if he was not in his bed or in his room. Other means of identification included the inscription of the patient's name to a piece of adhesive tape which was stuck to the patient. Aside from the fact that the tape was often irritating to the patient, the tape could readily be removed or exchanged, and the name was easily obliterated by body moisture.

"(17) The band shown in the Wallich patent No. 2,561,894 was thoroughly tested at the University of California Hospitals in San Francisco and found to be unsatisfactory not only because it could be removed and replaced and hence could be exchanged by the patients, but also because the data including the patient's name inscribed thereon became obliterated.

"(18) A band made in the manner described in the Smiley patent No. 2,449,181 would be dangerous to use inasmuch as it is constructed so as continually to tighten its grip around the patient's wrist to the point where circulation could be interfered with. No evidence was produced indicating that a band of the Smiley type had ever been commercially successful.

\* \* \* \* \* \*

"(20) The identification means disclosed in the patent in suit meets the criteria set forth above and solves the problem. It comprises a band in the form of an elongated tube of transparent plastic material which is adapted to be encircled about the wrist of a patient. The tube is made of a soft, lightweight, non-irritating plastic such as vinyl and is rendered non-stretchable by the inclusion therein of a piece of non-stretchable plastic material within the tube. Means which may take the form of a rivet is provided for positively securing the band around the wrist of the patient. A card bearing the patient's name and other desired data is provided for insertion into the tube, which insertion is accomplished by the exertion of a pushing force against a portion of the card, which portion may or may not be detachable, as desired. As the card is enclosed within the tube, it is protected against moisture and inasmuch as the tube is firmly secured as by a rivet or other means around the wrist of the patient, neither the card nor band is removable without cutting or tearing the tube, a fact which is readily apparent upon inspection. Thus, the identification means disclosed in the patent in suit certainly meets all the requirements of a patient identification system.

"(21) The identification means disclosed in the patent in suit is sold under the trade-mark IDENT-A-

BAND. The IDENT-A-BAND met with immediate and widespread success. In 1952, when the bands were first sold, sales amounted to a quarter of a million bands. By 1961 almost fifteen million bands were being sold annually. Thus, this would indicate a steady and substantial growth. There are about seven thousand hospitals in the United States and Canada, and as of the end of calendar year 1961, Plaintiff's IDENT-A-BAND product was being used in over four thousand hospitals.

"(22) Since 1955 the use of identification means of the type described in the patent in suit has been adopted on an increasing scale in the hospitals in California until at the present time, approximately 95% of the hospitals use such identification means. As a result, medication errors due to patient misidentification have been reduced from 45% to somewhere between 10 to 15%, the remaining errors being human errors rather than deficiencies in the identification means.

\*    \*    \*    \*    \*    \*

"(28) The identification means of the Schneider patent represents a combination of elements, and while the various constituent elements set forth in the patent are not new per se, the manner in which they are combined and utilized does result in a new product which is a proper subject for patent protection."

The lower court's conclusion of law number 7 reads as follows:

"The claims of the Schneider patent in suit express the novel concept constituting the Schneider invention and such concepts are set forth in terms of a combination of elements and their cooperative physical and functional relationship which contribute to the new result."

Appellants do not deny that the accused device infringes the Schneider patent if the latter is valid. They also concede, as they must, that the patent is presumed by law to be valid. 35 U.S.C. § 282.[1] Appellants strenuously contend, however, that the Schneider patent is invalid for want of "inventiveness." Their sole argument on appeal is that the patented device is merely the product of the exercise of ordinary professional skill rather than an achievement of the inventive faculty. The only prior art patents referred to on appeal by appellants are the patents to Wallich (2,561,-894) and Smiley (2,449,181). These patents are discussed in the lower court's findings of fact, numbers 17 and 18 respectively, quoted above.

There is no doubt that the validity of a patent must be measured according to whether or not it exhibits "invention." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Mr. Justice Jackson, writing for the majority in that case, pointed out that the elusive concept of invention does not lend itself to affirmative definition, but that certain attributes of invention are essential to validity where the patent in question is for a combination of old elements. "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable."[2] The elements must "take on some new quality or function from being brought into concert."[3] "The function of a patent is to add to the sum of useful knowledge."[4] In his concurring opinion in that case Mr. Justice Douglas emphasized that the determination of a patent's validity requires reference to the Constitutional grant of power to the Con-

1. 35 U.S.C. § 282 reads, in part:
   "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

2. 340 U.S. at 152, 71 S.Ct. at 130.
3. 340 U.S. at 152, 71 S.Ct. at 130.
4. 340 U.S. at 152, 71 S.Ct. at 130.

gress which permits the issuance of patents.

> "The Congress acts under the restraint imposed by the statement of purpose in Art. I, § 8. The purpose is 'To promote the Progress of Science and useful Arts * * *.' The means for achievement of that end is the grant for a limited time to inventors of the exclusive right to their inventions." [5]

This Circuit has observed that a combination patent, to be valid, must "perform some new or different function— one that has unusual or surprising consequences." Photochart v. Photo Patrol, 189 F.2d 625, 627 (9th Cir. 1951); Kwikset Locks Inc. v. Hillgren, 210 F.2d 483, 486 (9th Cir. 1954).

█ It is not a difficult task to discern the foregoing indicia of inventiveness in the present patent. What is the "something" which the combination of old elements in this patent contributes to the art, and renders the "whole" more than "the sum of its parts?" It *works*. None of the prior devices did.

The long felt need remained unsatisfied in spite of the attempts of the prior art. The peculiar combination of old elements necessary to actually accomplish the desired function had eluded both the artisan and the skilled mechanic for years. The Schneider patent hit upon that very combination with the result that it performed while the others merely promised. This result is sufficiently "new," "unusual" and "surprising" to indicate inventiveness.

The use of this device has reduced medication errors due to patient misidentification in California hospitals by at least 30%. The patented device meets the Constitutional requirement.

In his concurring opinion in the Atlantic & Pacific Tea case, supra, Mr. Justice Douglas distinguished patentable inventions from "gadgets." He stated that an invention must "be of such quality and distinction that masters of the scientific field in which it falls will recognize it as an advance." [6] Here, the facts establish that a group of experts undertook to investigate and solve the problem of patient misidentification. The investigation revealed that of all the identification devices known to the art, only appellee's patented device offered an effective solution to the problem. Thus, the patented device measures up to the criterion laid down by Mr. Justice Douglas. The Schneider patent is obviously more than a mere gadget.

█ The Schneider patent, therefore, filled a long felt need which the prior art had been unable to satisfy effectively. Accordingly, the patented device was hailed as an advance by experts in the scientific field, and acceptance of the device in the market resulted. The Schneider patent is not invalid for want of invention. See Stearns v. Tinker & Rasor, 220 F.2d 49 (9th Cir. 1955), and cases cited therein.

The District Court's judgment is affirmed.

---

5. 340 U.S. at 154, 71 S.Ct. at 131.

6. 340 U.S. at 155, 71 S.Ct. at 131.