The CARBORUNDUM COMPANY, Plaintiff,

v.

WILBANKS, INC., Defendant.

Civ. No. 65–416.

United States District Court D. Oregon.

Aug. 26, 1968.

Fredric A. Yerke, Jr., King, Miller, Anderson, Nash & Yerke, Portland, Or., for plaintiff.

James Campbell, Jr., Buckhorn, Blore, Klarquist & Sparkman, Portland, Or., for defendants.

## OPINION

KILKENNY, District Judge:

This is an action prosecuted by plaintiff against defendant for infringement of what is here called the Gould Patent, No. 3,067,816. Plaintiff is a Delaware corporation. Defendant is an Oregon corporation.

The Gould Patent was issued on December 11, 1962, on an application filed by William E. Gould. Plaintiff is now and has been since the issuance of the patent, the owner thereof. Jurisdiction is grounded on 28 U.S.C. § 1338(a). Defendant has no license from the plaintiff under the patent. Indeed, plaintiff and defendant are competitors in the business of manufacturing and selling suction box cover segments for paper making machines.

The stock from which paper is made is obtained from wood by either a mechanical or a chemical pulping process, which is the first step in the making of paper. This pulp is then passed through cleaners to remove the grit therefrom. The pulp has various other agents added thereto for the purpose of thickening, etc., to create what is known as the stock which is then fed to the paper making machine.

The stock used in forming the paper enters the paper making machine, generally a Fourdrinier machine, through a headbox onto the Fourdrinier wire. The Fourdrinier wire is a continuous belt, generally made of bronze wire, which rotates between two oppositely disposed rolls, the breast roll and the couch roll. The wire moves from the breast roll to the couch roll over a series of table rolls and suction boxes, and from the couch roll back to the breast roll through a series of stretch rolls and various means for cleaning the wire. The paper stock is formed at the headbox-breast roll area of the wire. Said stock contains approximately 99% water. A large part of the water is removed from the stock while it is on the wire. The suction boxes have holes or slots in the covers and by means of a vacuum the water is sucked from the stock and goes through the holes in the covers. The stock is then taken off at the couch roll area and passes through various other rolls including calendar rolls. The suction box is an important part of a paper making machine because of its ability to take water from the stock. The suction box cover is in direct contact with the wire in the operation of a machine. The suction box cover supports the wire against its own weight and the pull of the vacuum in the suction box.

End-of-grain maple has been the standard material utilized for the making of the suction box covers.

Although there are other bearing surfaces within a Fourdrinier machine, including forming boards and scrapers, the suction box cover is the most important because of the severe wire wear that occurs at that point in the machine. Heavy wire wear occurs at the suction box cover area because of the contact between the suction box cover surface and the wire, the abrasion of both surfaces by particulate material in the white water of the paper stock, and the presence of grit that becomes embedded in either the cover of the suction box or in the wire itself.

As the wires are expensive and as considerable loss of time in operations was caused because of their constantly having to be replaced, the paper making industry was anxious for a solution to the wire wear problem. The problem had been under study at least since the 1930's, but the problem did not become critical until the mid-50's when the machine speeds were greatly increased, thus producing increased wear.

In January, 1958, William E. Gould, a recent college graduate, was first exposed to the paper making industry. Mr. Gould was employed as a sales engineer in the New Products Branch of the Carborundum Company. With no knowledge of the work being done by the task force and after doing only cursory research into the problem, Mr. Gould recommended that "KT" Silicon Carbide be used in the suction box covers. "KT" Silicon Carbide was a new product developed by Carborundum. Mr. Gould contacted the Ontario Paper Company, who agreed to conduct tests. The results of these tests were most encouraging.

Application was made in January, 1960, for a patent on the Gould invention, and this patent was granted on December 11, 1962. The patent specifies the use of an impermeable ceramic having a density of approximately 80% or more of its theoretical density and a hardness of seven or more on Moh's scale. As specific examples the patent cites:

"Such materials may be a self-bonded ceramic, such as high-density, self-bonded silicon carbide. It may be a ceramic-bonded ceramic, such as silicon nitride-bonded silicon carbide. Also suitable are the hard, dense, metal-bonded ceramics, such as chromium-bonded alumina, and hard dense impregnated ceramics, such as zirconium diboride impregnated with molybdenum disilicide. Other specific hard, dense ceramics which can be used include titanium carbide, boron carbide, tungsten carbide, zirconium carbide, titanium boride, zirconium boride, titanium nitride, zirconia, alumina, nitride-bonded silicon carbide, metal-bonded titanium carbide, and metal-bonded tungsten carbide."

Wilbanks, Inc. has been engaged in the manufacture and sale of solid ceramic segments of aluminum oxide used in suction box covers since 1964. This ceramic material has a hardness of approximately nine on the Moh's scale and a surface finish of approximately 4–7 rms.

## ISSUES

(1) Is the Gould Patent invalid as an obvious, unpatentable substitution of materials?

(2) Was the Gould Patent placed on sale more than one year prior to the filing of the application for patent?

(3) Is the Gould Patent invalid because it is indefinite?

(4) Is the Gould Patent unenforceable because of patent misuse by

(a) fraudulent misrepresentation to the patent office regarding the Moh's scale?

(b) royalty rate discrimination?

(c) price fixing?

(d) improper interference settlement?

(5) Was the patent infringed?

## COMMENTARY

Inasmuch as formal findings and conclusions are indicated, I shall tend toward

brevity in my discourse on the issues presented.

■ At the outset, it is helpful to state a few well established rules that favor the position of the plaintiff. In passing on the issues, the Court must beware of the seductive influence of hindsight. Patterson-Ballagh Corp. v. Moss, 201 F.2d 403 (9th Cir. 1953). In an attack on a patent, it is not sufficient, in all cases, to show that other devices could be modified, or other materials used, so as to functionally duplicate the disputed evidence. Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658 (1892); Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944). Even the fact that an expert witness may be produced to show that the new device, which seemed to have eluded the researchers of the world, was always ready at hand and easy to be seen by mere skilled attention, is not controlling. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911). The fact that the Gould Patent does a job that no prior design accomplished is a fact that must be considered. Twentier's Research Co., Inc. v. Hollister, Incorporated, 319 F.2d 898, 902 (9th Cir. 1963). Not to be overlooked is the strong presumption as to the validity of the Gould Patent and that a heavy burden is placed on he who challenges validity. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Patterson-Ballagh Corp. v. Moss, supra.

The main issue to be resolved is whether the claims in the patent are sufficiently precise to conform with the guidelines stated in 35 U.S.C. § 112,[1] as construed by the applicable decisions. Defendant makes a forceable and an intelligent argument that the language of the patent is overly broad and cites The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221 (1895), in support.

To be kept in mind is the fact that the Gould Patent extends to all hard dense ceramic materials with a hardness of at least 7 on the Moh's scale and a density of 80%. Not only does the language cover the defendant's "KT" Silicon Carbide, but also Aluminum Oxide and many other materials. Of course, the other ceramic materials which have not yet been developed might well prove to be even more successful than the "KT" Silicon Carbide. Moreover, "ceramic" is an indefinite term. The patent does not attempt to define it. At least one of the experts defined "ceramic" as "inorganic, non-metallic materials altered by heat to volume." This definition would include crystalline and non-crystalline materials, which would encompass glass. Glass suction box covers were already covered by U. S. Patent No. 128,469. The evidence is undisputed that glass, with a density of over 80% and a hardness of at least 7, existed at the time of the application of the Gould Patent.

Moreover, a highly critical eye must be cast on the specifications of an 80% density with a hardness of 7 Mohs. "KT" Silicon Carbide itself has a hardness of 9 Mohs. The testimony is practically undisputed that a density of 80% is insufficient to give the mirror-like surface required for a successful cover. Flame sprayed aluminum oxide material, which had a density of 88% did not reach the

---

1. "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

required smoothness. Of less significance is the fact that the patent failed to specify whether the standard or the revised Moh's scale was to be used. The evidence demonstrates that there is a difference between the two scales. Quartz will scratch at 7 on the standard Moh's scale, but will not on the revised. There is nothing in the patent describing a "mirror-like surface." Nevertheless, this type of a surface is absolutely critical to success. All in all, it seems clear that the specifications of 80% density and a hardness of 7 Moh's are not critical and that the patent does not comply with the requirements of § 112. Helene Curtis Industries v. Sales Affiliates, Inc., 233 F.2d 148 (2d Cir. 1956). For that matter, it could well be said that the plaintiff has attempted to block off a whole area of scientific development by drawing over extended boundaries around its alleged invention. Brenner v. Manson, 383 U.S. 519, 534, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

I am also impressed with defendant's argument that the patent merely substitutes one material for another and is, therefore, invalid. In Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248 13 L.Ed. 683 (1850), the Court held that the mere substitution of materials was not patentable. There, the alleged invention consisted of the substitution of porcelain or clay for wood or metal in door knobs. The Court there held that the improvement of a product is the work of a skilled mechanic, not the genius of the inventor.

The evidence is quite clear that the paper making industry was searching for a solution to the wire wear problem. The Canadian Pulp and Paper Association established a special task force to study the factors promoting wire wear. The task force uncovered three causes of the wear problems. Drag load was found to be a factor since rubbing occurs at full velocity and in the presence of grit. The most attractive solution to this problem was to search for a better material than the presently used end-of-grain maple. This was the most inexpensive solution

because it did not necessitate a design change. Grit from the pulpstones was also found to be an important factor and it was determined that little wear would occur at the box covers in the absence of abrasive material. It was determined that no cleaning device was effective and that the best solution was to utilize a flat-box cover material which would reduce the influence of grit. The speed of the wire was also critical and here again it was proposed that a different material might be the best means of eliminating the speed effect.

At the time of the Gould invention end-of-grain maple was almost universally used in suction box covers. Previously, patented materials, such as glass, compressed graphic carbon, metal coated with enamel, chromium, and teflon, were all considered to be less successful. A second task force of the Canadian Pulp and Paper Association had undertaken a study of certain suction box cover materials and conducted extensive tests on teflon, nylon and rubber. Of these three materials, soft rubber seemed to respond most favorably, and further inquiries in this area seemed to be warranted. There were discussions whether the best covers would consist of "hard" or of "soft" materials. It was contended in favor of the "soft" materials, that the use of hard covers would lead nowhere because when two materials rub together, it is the softer one that is abraided. On the other side, it was contended that the physical condition of the abraiding surfaces is an important factor and thus a smooth hard surface may not wear away the rubbing material as rapidly as a softer rougher surface, especially under conditions of some lubrication. This was especially true as a result of the conclusions of the task force that, because of the grit factor, coarse laminates wore more severely than finer laminates.

The causes of the wear problem had been pinpointed. Gould was a good salesman. However, he was not experienced in the pulp and paper industry. He had a new product to sell, and when he learned of the problem, like any good

salesman, he suggested the use of "KT" Silicon Carbide. "KT" Silicon Carbide had already been used for similar purposes. In an article published by K. M. Taylor, the inventor of "KT" Silicon Carbide, in October, 1956, the author cited the new material for its *"outstanding abrasion resistance."* He recommended that it might be used "advantageously in such applications as check valves for handling corrosive liquids; linings for ball mills; heat exchanges for high temperature furnaces, pumps for die casting machines; combustion tables, and fuel elements and structural parts for gas cooled nuclear reactors." It also appears that "KT" Silicon Carbide was used in bearing members prior to the invention and in other wear resistant parts of papermaking machines. Carborundum had a newly patented material. It knew the properties of this material and was looking for areas where it could be utilized. Knowing its properties and learning of the wear problem affecting Fourdrinier wires, it was thus just another step to see if "KT" Silicon Carbide wouldn't be effective in this area. The fact that Gould was a "salesman" rather than an "inventor" appears to be totally irrelevant under the last sentence of 35 U.S.C. § 103, which provides that "patentability shall not be negatived by the manner in which the invention was made." Nonetheless, I think the development lacks patentable ingenuity. The problem of wire wear did not become of critical importance until the mid-fifties. Though porcelain, a ceramic material, had been used in the foils of papermaking machines to reduce wear, ceramics were never used in suction box covers because it was felt that their extremely high cost made them economically unjustified until the production levels were greatly increased in the late fifties. Indeed, even today, after the Gould "invention", the ceramic covers, due to their high cost, are used in only about 10% of the suction box covers used in the United States. Further, it is well recognized that the wood suction covers caused less wear after grit composed to a great extent of

silicon carbide from the pulpstones became imbedded in the surfaces thereby producing a smoother, harder surface. The properties of "KT" Silicon Carbide were well known. Indeed, the material had been introduced into other units of the paper making machines. I find it was a natural and obvious conclusion for Gould, upon being informed of the wear problem and the attempt to find a better material for the covers, to suggest the use of "KT" Silicone Carbide.

█ Here, the plaintiff's device had commercial success. It met a long felt, but an unsolved, need. These facts should be used to throw light on the circumstances surrounding the origin of the subject matter sought to be patented, but, in the last analysis, they are just *secondary* considerations. Graham v. John-Deere Co., 383 U.S. 1, 19, 86 S.Ct. 684, 695, 15 L.Ed.2d 545 (1966). It is there said, "He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Office."

It must be remembered that "KT" Silicon Carbide was a new product. It was not commercially available until 1956 —less than two years prior to the invention. And, indeed, the testimony is quite clear that many of the persons involved in testing new materials for the covers were unaware of its existence. It thus appears that had the properties of "KT" Silicon Carbide been generally known those skilled in the art would have quickly recognized it as admirably suited for use in paper making machines. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 333, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); Perma-Fit Shoulder Pad Co. v. Best Made Shoulder Pad Corp., 218 F.2d 747, 751 (2d Cir. 1955).

In the final analysis, the patent under consideration fails to indicate that flash of creative genius required for a true invention. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Wham-O Mfg. Co. v. Paradise Manufacturing Co., 327 F.2d 748 (9th Cir. 1964).

I find that the Gould Patent involved an obvious, unpatentable substitution of material and, consequently, invalid. Furthermore, it is invalid by reason of its indefiniteness in the respects previously mentioned.

In response to issue number (2), I find that the patent was not placed on sale more than one year prior to the filing of the application. The subject matter described and claimed in the Gould Patent in suit was not on sale in the United States more than one year prior to the date of filing of the application thereon, i. e., January 20, 1960. In respect of the transaction involving the eight segments manufactured by Carborundum and shipped to Quebec North Shore in October, 1958, for test purposes, no such segments and, consequently, no fully operative suction box cover incorporating the invention in issue were in existence at the date of the purchase order form utilized to activate the manufacture and delivery thereof.

At the date of the transaction involving the test segments, namely, July-October, 1958, Carborundum did not have ceramic segments for suction box covers on sale and did not, at any time, prior to the filing date of the Gould application have on sale or hold itself out as willing to sell for commercial use ceramic suction box covers. The aforesaid transaction was wholly for experimental purposes, both Carborundum and Quebec North Shore contributing to the costs of said experimental program. The use by Quebec North Shore of the eight test segments of "KT" Silicon Carbide manufactured by Carborundum and shipped to Quebec North Shore in October, 1958, was wholly experimental and said segments were insufficient to make one full suction box cover.

The patent, if valid, would not be unenforceable on account of patent misuse. The evidence supports a finding that plaintiff believed the patent to be valid. That being the case, it should not be charged with bad faith or with knowledge of invalidity. Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F.2d 624 (9th Cir. 1953).

A discussion of all of the authorities cited by the respective parties would greatly over-extend this already protracted opinion. Enough to say, they have received my study and analysis.

It is not unlikely that plaintiff will prosecute an appeal in this cause. If the Court of Appeals should hold that my findings on invalidity of the Gould Patent are clearly erroneous, I have no hesitancy in finding that defendant's devices infringed on the plaintiff's patent. Defendant's suction box covers are made of ceramic material. They are dense and have a hardness of at least 7 on the Moh's scale. They are wear resistant and will not retain grit and have zero porocity and consequently impermeable. They admittedly have a density of at least 80%. They have a plurality of segments and are either slotted or drilled for extraction of water from the stock. Defendant's covers have increased production on paper machines and have increased wire life approximately 30%. The increased productivity of defendant's covers are due to the use of the teachings employed in the Gould Patent. Its manufacture and sale of these suction box covers commenced in the spring of 1964 and it sold covers to the industry for machines where the customer was already using the plaintiff's covers on another machine. Consequently, if the Gould Patent is valid, defendant has infringed it.

By order of the Court, each of the parties presented findings in support of their respective theories. These proposed findings, supported by citations to the record, were extensively used by me in deciding the issues. Inasmuch as I have found plaintiff's patent invalid, I have heavily relied on the findings proposed by the defendant. The use of the precise language of an expert is of the greatest importance in the formulation of a proper finding in a patent case. This type of case necessarily involves technical and highly complex problems. Accordingly, the aid of the language of

the specialist is not only suggested, but is almost a necessity. Vincent v. Suni-Citrus Products Co., 215 F.2d 305, 310–311 (5th Cir. 1954); Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962). The practice has been approved in the Ninth Circuit, even in non-patent cases. Molitor v. American President Lines, Ltd., 343 F.2d 217 (9th Cir. 1965); Glens Falls Ins. Co. v. Satree, 320 F.2d 92 (9th Cir. 1963).

This opinion shall supplement and explain my formal findings and conclusions this day signed. An appropriate decree of dismissal shall be prepared, served and presented.